TRE JOHNSHON, #929384,

          Petitioner,                Case Number: 4:16-12160
                                       Honorable Linda V. Parker

v.

THOMAS WINN,

          Respondent.
_____/

**OPINION AND ORDER**
**DENYING PETITION FOR WRIT OF HABEAS CORPUS**
**AND DENYING CERTIFICATE OF APPEALABILITY**

      Tre Johnson ("Petitioner") is presently in the custody of the Michigan Department of Corrections, pursuant to convictions for first-degree murder based on alternative theories of premeditated murder and felony murder, possession of a firearm during the commission of a felony, and unlawfully driving away an automobile. His petition raises three claims for relief: his involuntary confession should have been suppressed; insufficient evidence supported the convictions; and the jury was improperly instructed that Petitioner had a duty to retreat and counsel was ineffective for failing to object to the instruction. The Court finds that none of Petitioner's claims satisfy the strict standards for habeas corpus relief. The petition will be denied.

# I.    Background

Petitioner's convictions arise from the shooting death of Leonard Graham, III. The Michigan Court of Appeals set forth the following relevant facts in its decision affirming Petitioner's convictions:

> Defendant was convicted of fatally shooting 24–year–old Leonard Graham on September 15, 2013, in Southfield, Michigan.  On September 14, Graham drove his white Chevrolet Impala to defendant's apartment, where he, defendant, and two female friends celebrated Graham's birthday by watching a boxing match.  In the early morning hours of September 15, Graham's two female friends left, leaving defendant and a sleeping Graham in the apartment.  Graham's whereabouts were thereafter unknown for several days until his body was found in a wooded area near defendant's apartment.  Graham died from a single gunshot to the back of his head.

> Before Graham's body was found, defendant told Graham's father that he had not seen Graham since Graham was picked up by one of Graham's relatives.  In the meantime, defendant had been driving Graham's Impala, and had told his girlfriend and the mother of his child, Paris Wilson, that the vehicle belonged to him.  When Graham's father went to defendant's apartment and confronted defendant, he observed baby items in the car and it appeared as though defendant and Wilson were "moving into the car."  Defendant had also covered or replaced a sticker on Graham's Impala, gave Wilson a spare key to the car, and talked about having the color of the car changed.  Wilson was not concerned that the car belonged to Graham because, at some time before September 14, defendant said that the person for whom he was house-sitting was going to give him a white Impala so he could get to work.  However, Wilson subsequently testified that defendant did not have a job.

> After obtaining a warrant, the police executed a search at defendant's apartment shortly after midnight on Friday, September 20.  In the living room, the police observed what appeared to be drops of blood underneath a sofa on the carpet.  By the time the police completed their search, Graham's body had been found outside the residence.  The case was turned over to the Southfield Police.

Before Graham's body was found, defendant's father had taken defendant to the Wixom police station on September 19, at approximately 6:00 p.m., where defendant was interviewed by Wixom Detective Michael Desrosiers. During this initial interview, which lasted approximately one hour and 20 minutes, defendant was not in custody. Defendant denied knowing Graham's whereabouts. Defendant stated that Graham and two girls came to his apartment to watch a boxing match. Graham and the girls drank and smoked marijuana, but defendant did not. At one point, the alcohol caused Graham to vomit, but Graham cleaned it up. Graham lied down on a couch and, after the boxing match concluded, the two girls left. The next morning, Graham drove defendant to his parents' Detroit house and dropped him off. Defendant went to church that morning and did not see Graham again until Tuesday. On Tuesday, Graham came to the apartment, the two played video games, and ultimately Graham asked defendant if he had a shotgun because he needed to take care of a few things. Defendant responded that the one in the apartment was broken. Graham left, leaving his car keys behind. Defendant claimed that Tuesday was the last time he saw or talked to Graham.

Subsequently, defendant voluntarily went to the Oakland County Sheriff's Office, where he was interviewed by Deputy Christopher Lanfear at approximately midnight; defendant was not in custody at the time. Initially, defendant's statement was consistent with what he told Detective Desrosiers, but the deputy advised defendant that he did not quite believe his story. Defendant then stated that, on Tuesday, he heard a gunshot as Graham and another man, whom he did not know, were leaving the apartment. When he looked out the window, he observed the unknown man drag Graham's body, put it in a car, and drive away. In response, Deputy Lanfear told defendant that the story did not make sense, that he should tell the truth, and that, if he did something in self-defense, he should explain his position. Defendant then stated that there was a struggle between him and Graham in the living room, and he shot Graham one time in the head, at close range, with a .357 pistol. Defendant ultimately wrapped Graham's body in bedding and put it outside in some bushes. Following the interview with Deputy Lanfear, defendant remained at the Sheriff's Department until the Southfield Police arrived.

Southfield Police Detectives William Smarsty and Wojaciechowski

interviewed defendant on September 20, at approximately 3:30 a.m. By the time of the interview, Graham's body had been found in the woods and blood had been found in defendant's apartment. Detective Smarsty testified that he read defendant his constitutional rights, and defendant stated that he understood, waived his rights, and agreed to speak with the detectives. Defendant was in custody at this time. Defendant again stated that Graham went to his house to watch a pay-per-view fight on television and there were a couple of girls there also. Graham drank and smoked marijuana, and eventually threw up in the kitchen from drinking too many shots. After the girls left, Graham repeatedly messed with him, and defendant told Graham to turn down the radio because he wanted to sleep to prepare for church. Defendant and Graham engaged in a pushing match, fell onto the couch, and were face-to-face as Graham held him around the neck; defendant could not breathe. After the detectives told defendant that the scenario was impossible and demonstrated that Graham's arms would have had to have been across the back of defendant's neck, not around the front of it, defendant stated, "That's how it was."

Defendant further stated that he was lying on top of Graham, face-to-face, and, with his left arm, he reached underneath the couch's arm rest to retrieve his gun and fired one shot to the back of Graham's head; the gun was very close to Graham's head. Afterward, defendant picked up Graham's feet and put them on the couch. Because he was scared, defendant took Graham's car keys and cell phone and left the apartment. Defendant stated that, after unloading the gun, he took it to his parents' house on Burgess[]; he also stated that there was a box of ammunition under a bed. Defendant explained how he cleaned up the couch with household cleaners. On Sunday night, defendant wrapped Graham's body in bedding and dragged him into the woods. Defendant admitted that he put a sticker on Graham's car to try to disguise it. Later, defendant claimed that he put the sticker on the car before watching the fight to play a joke on Graham.

Detective Smarsty testified that he went to the Burgess house and recovered the gun and a box of ammunition under the bed. Michigan State Police Sergeant Shawn Kolonic, who testified at trial as an expert in the area of firearms and tool marks, examined the recovered .357 Magnum Ruger revolver, as well as the fired bullet jacket fragment, fired bullet

core, and metallic fragment removed from Graham's skull. He determined that the bullet jacket fragment came from the .357 revolver. Cheryl Loewe, the Oakland County Deputy Medical Examiner, performed the autopsy on September 20, and was qualified at trial as an expert in forensic pathology. Lowe explained that Graham had one gunshot entrance wound on the back of his head, and there was no evidence of close range firing. After being shot, Graham would have died within seconds. Graham had no bruises or injuries on his body, was wrapped in bedding, and was not wearing shoes.[]

Detective Smarsty testified that at approximately 5:30 p.m., he spoke with defendant again after learning from the medical examiner that the gunshot had to have been fired from at least two feet away, as opposed to close range. Defendant had been in the holding cell at the Southfield Jail, with access to a bed, bathroom, food, and water. Detective Smarsty testified that during the follow-up interview, defendant initially stayed with his last version until the detectives explained the medical examiner's findings, i.e., that the gunshot could not have been taken at close range because there was no stippling or gun residue on Graham's skull. Defendant then stated that Graham had choked him face-to-face for close to 10 seconds before they both went and sat on the couch. Graham tripped him again, and they messed around some more before Graham sat on the couch and defendant sat on the love seat—a separate couch. Defendant then got up, grabbed the gun underneath the armrest of the couch, took a few steps back, pointed the gun at Graham's head, and took one shot. Defendant stated that Graham did not see him take the gun out. Defendant claimed that Graham had pushed him, tripped him, and choked him. Defendant stated that he did not have any injuries, specifically no bleeding or bruising. While initially stating that "Graham "shouldn't have choked [him]," defendant eventually acknowledged that he had gone too far.

Detective Smarsty explained that given the lack of injuries to defendant, they had a specialist take photographs of defendant's body to show that there were no injuries and trauma evidence from an altercation or incident. The detective also testified that based on the booking information, defendant is six-feet tall and weighed 150 pounds. Based on the medical examiner report, Graham was 6'2" and weighed 136 pounds. During the interview, defendant described himself as "little", noting that Graham was more muscular than him. Defendant told Detective Smarsty that he made

some calls on Graham's phone, but never texted on it. However, Graham's father and friend had received text messages from Graham's phone on Sunday and Monday. On Monday, September 16, defendant sold Graham's phone to a Metro PCS on Eight Mile Road in Detroit and received $200. Graham's phone was never recovered.

*People v. Johnson*, No. 321575, 2015 WL 5495975, at *1-3 (Mich. Ct. App. Sept. 17, 2015). These facts are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith*, 581 F.3d 410, 413 (6th Cir. 2009).

Petitioner was convicted by a jury in Oakland County Circuit Court and, on April 21, 2014, sentenced to life imprisonment for the murder conviction, to be served consecutively to concurrent prison terms of two years for the felony-firearm conviction and 213 days for the unlawfully driving away an automobile conviction.

Petitioner's convictions were affirmed on appeal. *Johnson*, 2015 WL 5495975, *leave to appeal denied*, 876 N.W.2d 554 (Mich. 2016).

Petitioner then filed the pending petition for a writ of habeas corpus. He asserts the following grounds for relief:

I. Petitioner's confession to police and waiver of his *Miranda* rights were involuntary and, thus, the trial court erred in denying his motion to suppress them and allowing their introduction at trial.

II. The evidence of premeditation was insufficient.

III. The prosecutor and trial court erroneously urged the jury to consider whether Petitioner was required to retreat.

## II.    Standard

Title 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The AEDPA "imposes a highly deferential standard for evaluating state-court rulings," and "demands that state-court decisions be given the benefit of the doubt."

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations omitted). A "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. Pursuant to section 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* A "readiness to attribute error [to a state court] is inconsistent with the presumption that state courts know and follow the law." *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption of correctness only with clear and convincing evidence. *Id.* Moreover, for claims that were adjudicated on the merits in state court, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. Discussion

### A.     Admission of Petitioner's Statement

Petitioner's first claim for relief concerns the admissibility of his statements to police. He argues that his confession and waiver of his *Miranda* rights were involuntary

for these reasons: (1) he was interrogated numerous times for several hours, resulting in a total interrogation time of approximately nine hours; (2) he was held "completely cut off from his family and anyone else for 24 hours"; (3) he was deprived of sleep; (4) he may not have been provided food; (5) the officers repeatedly told defendant they did not believe him, increasing the pressure to confess; and (6) he was young and inexperienced, having never have been convicted of a crime.[1]  *Johnson,* 2015 WL 5495975 at *7.

Prior to trial, the trial court conducted an evidentiary hearing pursuant to *People v. Walker*, 132 N.W.2d 87 (Mich. 1965), to determine the voluntariness of Petitioner's statement to police.  Two witnesses testified: Christopher Lanfear, a deputy with the Oakland County Sheriff's Department, and William Smarsty, a detective with the City of Southfield Police Department.

Deputy Lanfear began interviewing Petitioner at approximately midnight on September 20, 2013.  The interview occurred after Petitioner had been interviewed at the Wixom Police Department for approximately one hour and twenty minutes.  Prior to the interview, Deputy Lanfear advised Petitioner of his *Miranda* rights and Petitioner signed an advice of rights form.  (ECF No. 10-4 at Pg. ID 204-07.)  Ultimately, Petitioner admitted that he shot Graham on the night of September 14th, when the two were fighting

---

[1]   In his habeas petition, Petitioner's argument focuses primarily on the length of the interrogation and that he was held "incommunicado" for an extended period of time. (ECF No. 1 at Pg. ID 5.)  Because the Court construes *pro se* pleadings liberally, *see Martin v. Overton,* 391 F.3d 710, 712 (6th Cir. 2004), the Court presumes Petitioner challenges his waiver and confession for all of the reasons argued in the Michigan Court of Appeals.

and struggling inside Petitioner's apartment.  (*Id.* at 211.)  Deputy Lanfear contacted the Southfield Police Department because Petitioner's apartment was located in Southfield.

Detective Smarsty testified that he interviewed Petitioner following his polygraph examination.  At that point, Petitioner was in custody and before questioning him, Detective Smarsty advised Petitioner of his *Miranda* rights.  (*Id.* at 226-29.)  The interview began around 3:30 a.m., and lasted approximately two hours.  (*Id.* at 229.) Detective Smarsty noted that Petitioner did not appear to be under the influence of alcohol or drugs.  Detective Smarsty questioned Petitioner about his physical struggle with Graham.  Detective Smarsty found Petitioner's account incredible.  (*Id.* at 229-30.)

At approximately 5:30 p.m. on September 20th, Detective Smarsty questioned Petitioner a second time after learning that the medical examiner found no gunshot residue on the victim and concluded that the gun was fired more than two feet from the victim's head.  (*Id.* at 234.)  Detective Smarsty informed Petitioner that he was protected under the same *Miranda* rights explained to him earlier in the day.  (*Id.* at 236-37.)  The detective offered Petitioner something to eat or drink before the interview.  Petitioner declined.  (*Id.* at 237.)  Detective Smarsty told Petitioner that his version of what occurred was inconsistent with what the medical examiner found and Petitioner altered his story (Detective Smarsty was not asked in what ways Petitioner changed his story). (*Id.* at 237.)  The second interview lasted approximately one hour.  (*Id.* at 242.)

Petitioner chose not to testify at the *Walker* hearing.  (*Id.* at 53-54.)

Based upon the *Walker* hearing testimony and a review of the interview tapes, the trial court denied Petitioner's motion to suppress the confession. The trial court summarized its findings as follows:

> In observing the interviews, this Court did not see that the officers in any way badgered the defendant, they didn't attempt to lead him in any way. The defendant was coherent, he didn't appear to be under the influence of any medication or other drugs.
>
> The defendant is a high school graduate and he also indicated that he was taking classes at Henry Ford Community College. The defendant appeared to understand what was being asked of him and what was said to him.
>
> Based upon my observations of both the DVDs and the testimony that's been - - that was heard by this Court, it appears to this Court that the defendant did voluntarily waive his rights based upon the totality of the circumstances, and that nothing that I heard or that I saw indicated that his confession was either coerced or that he did not understand what was going on.
>
> So this Court is not (ph) going to suppress the defendant's confession.

(3/13/2014 Tr. at 7, ECF No. 10-5 at Pg. ID 267.)

The Michigan Court of Appeals also denied Petitioner's claim:

> As an initial matter, defendant misrepresents the circumstances of the repeated interviews that occurred during his 24–hour "detention." Accompanied by his father, defendant voluntarily went to the Wixom Police Department on September 19, 2013, at approximately 6:00 p.m. He was not in custody and, as the trial court aptly observed, "he was free to leave at any time he chose to do so." After this initial interview, defendant agreed to take a polygraph examination, which necessitated travel to the Oakland County Sheriff's Department. The polygraph examination interview -- the second interview -- occurred at 12:26 a.m.; the preparation and actual questioning lasted less than two hours. Defendant was advised of his *Miranda* rights before he was questioned, indicated that he

understood those rights, and signed a written waiver. The evidence established that defendant declined the interviewing deputy's offers of water and food, and to use the bathroom. After defendant failed the polygraph examination and it was disclosed that Graham was shot in Southfield, Southfield police detectives were summoned to further interview him. Southfield police detectives arrived and began interviewing defendant at approximately 3:20 a.m. He was again advised of his Miranda rights, indicated that he understood those rights, and signed a written waiver. The interview lasted approximately two hours, upon which defendant was transported to the Southfield jail, where a bed, water, food, and bathrooms were available. The Southfield detectives had no further contact with defendant until they interviewed him at 5:30 p.m. after receiving new information; this final interview lasted less than one hour. The evidence indicated that, before beginning this last interview, defendant declined the detectives' offer of sustenance.

Given this record, the totality of the circumstances indicate that defendant was not coerced through prolonged questioning or detention, but that defendant attempted to falsely deny involvement in the crime, and voluntarily submitted to a polygraph examination as a means of lending credibility to his exculpations. When confronted with suggestions that his performance was unconvincing and with newly discovered evidence, he altered his account, ultimately opting to confess his involvement, despite full knowledge of his constitutional rights. There is no evidence that defendant was threatened, abused, or promised anything in exchange for his statements. Nor is there evidence that the police deliberately isolated defendant from his family for the purpose of coercing a confession or that defendant ever requested the opportunity to speak with his family. Even if he had, the police would not have been required to grant such a request for an adult suspect facing a murder charge. There is likewise no evidence that defendant was ill, intoxicated, under the influence of drugs, or deprived of food or drink. Although defendant claims that he was sleep deprived, defendant never complained or indicated to the police that he was tired, and the video recording and the detective's testimony demonstrates that defendant was consistently alert, attentive, and focused on the questions asked of him. While defendant suggests that his youth should be considered, nothing elicited during the hearing established that defendant's age or circumstances impaired his ability to make a voluntary statement. He was 21 years old, could read and write, was taking criminal

justice classes in community college, and there is no indication that he had any learning disability or psychological problems.

Viewing the totality of the circumstances, we are not convinced that a mistake was made in denying defendant's motion to suppress his statements. Defendant did not testify about the circumstances of his statements. Thus, the trial court rendered its decision from the video recordings of defendant's interviews and the testimony of the officers who conducted the interviews, which the trial court apparently found to be credible. Because the evidence was sufficient to support the trial court's finding, and giving deference to the trial court's assessment of the evidence and the officers' credibility, there is no basis to disturb the trial court's findings.

*Johnson,* 2015 WL 5495975, at *6-8.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988). The ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Factors to consider include the presence or absence of police coercion (a "crucial element"), length of interrogation, location of interrogation, continuity of interrogation, the suspect's maturity and education, the suspect's physical condition and mental health, and whether the suspect was advised of his or her Miranda rights. *Withrow v. Williams*, 507 U.S. 680, 693-94

(1993).  A confession may not be deemed involuntary absent coercive police activity.

*Connelly*, 479 U.S. at 167 (stating that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause").  The decision of a state court to credit certain testimony is "presumed to be correct."  28 U.S.C. § 2254(e)(1); *see also Ramonez v. Berghuis*, 490 F.3d 482, 490-91 (6th Cir. 2007) (noting that § 2254(e)(1) standard of review applies to a state court's credibility determinations in the context of a hearing on a motion to suppress a confession).

The Court has reviewed the videotaped interviews that are part of the state court's and this Court's records.  Nothing in the tapes contradicts or calls into question the state courts' conclusion that Petitioner's statements were voluntary.  Petitioner no doubt is distressed in portions of the interviews.  At the same time, he clearly understands the proceedings and is responsive to questions.  The videos show police asked Petitioner whether he needed food or drink.  He declined these offers.  Petitioner does not ask to speak with any family members in the videos.  The questioning officers remain calm throughout all of the interviews; their tone is conversational, not confrontational.  Finally, although the Petitioner may not have had any prior contact with law enforcement, he informed police officers that he was studying criminal justice at a community college. The Court notes that the extent of Petitioner's criminal justice studies is not known and is deemed to be an insignificant factor in its analysis.

Considering the totality of these circumstances, the Michigan Court of Appeals' decision that Petitioner's statements were made voluntarily, knowingly, and intelligently was not contrary to or an unreasonable application of federal law. Therefore, habeas relief is denied on this claim.

## B. Sufficiency of the Evidence

In his second claim, Petitioner asserts that insufficient evidence supported his first-degree murder conviction. He argues that the prosecution failed to present sufficient evidence to prove the elements of either alternative theory of first-degree murder.[2]

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). On direct review, review of a sufficiency of the evidence challenge must focus on whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16).

---

[2] The Court construes the *pro se* petition broadly and presumes Petitioner challenges both theories supporting the first-degree murder conviction as he did in state court.

"Two layers of deference apply to habeas claims challenging evidentiary sufficiency." *McGuire v. Ohio*, 619 F.3d 623, 631 (6th Cir. 2010) (citing *Brown v. Konteh*, 567 F.3d 191, 204-05 (6th Cir. 2009)). First, the Court "must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Brown*, 567 F.3d at 205 (citing *Jackson,* 443 U.S. at 319). Second, if the Court were "to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, [the Court] must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable." *Id.* In short, "deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; [then] deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (citation omitted). The *Jackson* standard is "exceedingly general" and therefore Michigan courts are afforded "considerable leeway" in its application. *Davis v. Lafler*, 658 F.3d 525, 535 (6th Cir. 2011).

Under Michigan law, to convict a defendant of first-degree premeditated murder, the prosecution must prove that the defendant intentionally killed the victim and that the killing was premeditated and deliberate. *People v. Anderson*, 531 N.W.2d 780, 786 (Mich. Ct. App. 1995). Premeditation and deliberation may be established by evidence showing: "(1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after

the homicide." *People v. Schollaert*, 486 N.W.2d 312, 318 (Mich. Ct. App. 1992).

Direct or circumstantial evidence and reasonable inferences arising from that evidence

may constitute satisfactory proof of the elements of an offense, *People v. Jolly*, 502

N.W.2d 177, 180 (Mich. 1993), including the identity of the perpetrator, *Dell v. Straub*,

194 F. Supp. 2d 629, 647 (E.D. Mich. 2002), and the defendant's intent or state of mind,

*People v. Dumas*, 563 N.W.2d 31, 34 (Mich. 1997).

The Michigan Court of Appeals held sufficient evidence supported both elements

of first-degree premeditated murder. The state court cited several key pieces of evidence.

Petitioner told police that Graham choked him for approximately 10 seconds, then the

two separated and sat upon separate couches. After each had retreated to their respective

couches, Petitioner stood up, grabbed gun from underneath the couch cushion, took a few

steps back and fired. *Johnson*, 2015 WL 5495975, at *9. The state court of appeals held

that, even accepting Petitioner's version of events, the evidence "was sufficient for a jury

to find premeditation and deliberation beyond a reasonable doubt because defendant

acted after the physical altercation had ended and Graham was sitting on a separate

couch." *Id.* The time during which Petitioner retrieved the gun, stepped back, and aimed

the gun at Graham afforded Petitioner sufficient time "to take a second look." *Id.*

(quotation marks and citation omitted).

The jury also heard evidence concerning Petitioner's actions after the murder. He

attempted to conceal Graham's death, hid Graham's body, and gave police multiple

versions of what transpired. *Id.* The prosecution also presented evidence that Petitioner

coveted Graham's white Chevrolet Impala—before Graham's death, Petitioner told the mother of his child that he would soon be given a Chevrolet Impala. *Id.* Indeed, after Graham's death, Petitioner treated the Impala as his own, covered a distinctive sticker in the back window, and loaded many personal items into the car. *Id.* The Michigan Court of Appeals held that all of these circumstances supported a conclusion that Petitioner acted with premeditation motivated by a desire to obtain Graham's car.

The Michigan Court of Appeals' holding is amply supported in the record. Petitioner argues that the state court failed to consider that Graham attacked Petitioner before the shooting. Even assuming that Graham did so, Petitioner nevertheless could have acted with premeditation. According to Petitioner's own statement, he and Graham each retreated to different couches before the shooting. Petitioner retrieved the gun and stepped back before shooting Graham. Although the minimum time required under Michigan law to premeditate "is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a 'second look.'" *Williams v. Jones*, 231 F. Supp. 2d 586, 594-95 (E.D. Mich. 2002). "[A]n opportunity for a 'second look' may occur in a matter of seconds, minutes, or hours, depending upon the totality of the circumstances surrounding the killing." *People v. Berthiaume*, 229 N.W.2d 497, 500 (Mich. Ct. App. 1975). A rational trier of fact could find beyond a reasonable doubt that Petitioner had an opportunity to take a "second look" between the time he and Graham wrestled and when

Petitioner shot Graham in the head. The Michigan Court of Appeals' decision is not contrary to or an unreasonable application of Supreme Court precedent.

Petitioner also challenges the sufficiency of the evidence on the alternative theory of first-degree felony murder, with a predicate crime of larceny. Under Michigan law, the elements of first-degree felony murder are: (1) the killing of a human being; (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm would be the probable result; (3) while committing, attempting to commit, or assisting in the commission of any of the felonies enumerated in Mich. Comp. Laws § 750.316. *People v. Smith*, 478 Mich. 292, 318-19 (2007). Larceny is one of the felonies enumerated in Mich. Comp. Laws § 750.316. The elements of larceny are: "(1) an actual or constructive taking of goods or property, (2) a carrying away or asportation, (3) the carrying away must be with a felonious intent, (4) the subject matter must be the goods or personal property of another, (5) the taking must be without the consent and against the will of the owner." *Johnson*, 2015 WL 5495975, at *10 (quotation marks and citation omitted). The felony-murder statute requires "that the defendant intended to commit the underlying felony at the time the homicide occurred." *People v. Brannon*, 486 N.W.2d 83, 86 (Mich. Ct. App. 1992). The "felony-murder doctrine will not apply if the intent to steal property of the victim was not formed until after the homicide." *Id.*

The Michigan Court of Appeals found sufficient evidence to sustain Petitioner's felony-murder conviction:

> Evidence that defendant told his girlfriend that he was getting a white Impala before he killed Graham, and that, after he killed Graham, he identified the Impala as his own, attempted to disguise it, drove it regularly, moved his family's personal items into the car, gave his girlfriend a spare car key, and discussed his plan to change the Impala's color, viewed in a light most favorable to the prosecution, was sufficient for a rational trier of fact to find beyond a reasonable doubt that defendant formulated the intent to steal Graham's car before he killed Graham. Consequently, there was sufficient evidence to sustain defendant's conviction for felony murder.

*Johnson*, 2015 WL 5495975, at *10.

Viewing all of the evidence under the doubly deferential standard that applies on federal habeas review, Petitioner has not shown that the state court's decision was unreasonable or that he is entitled to relief under *Jackson*. Therefore, habeas relief is also denied on this claim.

### C.  Duty to Retreat Jury Instruction

Petitioner alleges that the trial court erred in giving a duty to retreat jury instruction because the shooting occurred in his own home. He also argues that defense counsel was ineffective in failing to object.[3]  Respondent argues that the jury instruction claim is procedurally defaulted and meritless. Procedural default is not a jurisdictional bar to review of a habeas petition on the merits. *Trest v. Cain*, 522 U.S. 87, 89 (1997). "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003)

---

[3]  Petitioner raised this ineffective assistance of counsel claim on direct review in state court, but did not reference it in his habeas petition. Respondent addressed the ineffectiveness claim in his answer to the petition, as did Petitioner in his reply brief. Once again, according Petitioner's *pro se* petition liberal construction, the Court concludes that the petition raises an ineffective assistance of counsel claim.

(citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). The Court finds it is more efficient to proceed to the merits of Petitioner's jury instruction claim.

As part of a self-defense instruction, the trial court gave the following instruction regarding duty to retreat:

> A person can use deadly force in self-defense only where it is necessary to do so. If the defendant could have safely retreated but did not do so, you may consider that fact in deciding whether the defendant honestly and reasonably believed he needed to use deadly force in self-defense.
>
> However, a person is never required to retreat if attacked in his own home, nor if the person reasonably believed that an attacker is about to use a deadly weapon, nor if the person is subject to a sudden, fierce and violent attack.
>
> Further, the person is not required to retreat if the person has not or is not engaged in the commission of a crime at the time the deadly force is used, and has a legal right to be where the person is at that time, and has an honest and reasonable belief that the use of deadly force is necessary to prevent eminent [sic] death or great bodily harm of the person or another.
>
> The defendant does not have to prove that he acted in self-defense. Instead, the prosecutor must prove beyond a reasonable doubt that the defendant did not act in self-defense.

(3/18/2014 Tr. at 142-42, ECF No. 10-7 at Pg. ID 836-37.)

The Michigan Court of Appeals denied relief because the instruction, "viewed in its entirety, fairly presented the defense of self-defense and sufficiently protected defendant's rights." *Johnson*, 2015 WL 5495975, at *12. The court found Petitioner was "not prejudiced by the trial court's initial reference to the general duty to retreat because its effect, if any, was nullified by the trial court's immediate subsequent and specific

instruction that 'a person is *never* required to retreat if attacked in his own home.'" *Id.* (emphasis supplied by Michigan Court of Appeals).

On federal habeas review, a petitioner is entitled to relief only if a jury instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973). A state court's finding that challenged jury instructions "adequately reflected the applicable state law and corresponding state charges" is binding on federal habeas review. *White v. Steele*, 629 Fed. App'x 690, 695 (6th Cir. 2015). In consideration of the deference owed the state court's assessment of the adequacy of these instructions, the Court holds that Petitioner fails to show that the state court's holding was contrary to or an unreasonable application of Supreme Court precedent.

The Michigan Court of Appeals also rejected Petitioner's claim that defense counsel was ineffective in failing to object to this instruction:

> [D]efendant cannot succeed on his ineffective assistance of counsel claim. Because the jury was, in fact, informed that a person attacked in his own home has no duty to retreat, it was not objectively unreasonable for counsel not to object to the instructions. Further, defendant cannot show any prejudice arising out of defense counsel's failure to object. *Heft*, 299 Mich. App. at 81. As in *Richardson*, "the success of defendant's self-defense claim did not hinge on whether he was required to retreat or stand his ground on his porch. Rather, it hinged on whether he honestly and reasonably believed that it was necessary to use deadly force while standing his ground." *Richardson*, 490 Mich. at 122. Accordingly, defendant's alternative claim of ineffective assistance must fail.

*Johnson,* 2015 WL 5495975, at *12.

An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under the AEDPA, the standard for obtaining relief under *Strickland* is very difficult to meet because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (internal citations and quotation marks omitted). This doubly deferential standard requires the Court to give "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow,* 571 U.S. 12, 15 (2013).

The Michigan Court of Appeals applied the *Strickland* standard in deciding Petitioner's ineffective assistance of counsel claim. As discussed, the totality of the instruction correctly and clearly set forth Michigan law on self-defense. The state court's conclusion that counsel was not ineffective for failing to object to the self-defense instruction, therefore, was not an unreasonable application of *Strickland*. Therefore, habeas relief is also denied on Petitioner's final claim.

## IV.     Certificate of Appealability

"[A] prisoner seeking postconviction relief under 28 U.S.C. § 2254 has no automatic right to appeal a district court's denial or dismissal of the petition. Instead, [the] petitioner must first seek and obtain a [certificate of appealability.]" *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28

U.S.C. § 2253(c)(2). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 336 (2003) (internal quotation marks and citations omitted).

Reasonable jurists would not find the Court's assessment of Petitioner's claims to be debatable or wrong. The Court therefore declines to issue a certificate of appealability.

## V.    Order

Accordingly,

**IT IS ORDERED** that the petition for writ of habeas corpus is **DENIED.**

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED.**

**IT IS FURTHER ORDERED** that Petitioner may proceed *in forma pauperis* on appeal because an appeal may be taken in good faith. 28 U.S.C. § 1915(a)(3).

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: August 27, 2019

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, August 27, 2019, by electronic and/or

U.S. First Class mail.

s/ B. Sauve
Case Manager